1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**

2
**ATLANTA DIVISION**

3      IN RE:                    )      Chapter 7
                                 )
4      CURTIS PARKER,            )      Case No. 25-61216-BEM
                                 )
5                                )
          Debtor.               )
6

7      <u>**TRANSCRIPT OF HEARING ON DEBTOR'S EMERGENCY MOTION FOR**</u>
       <u>**TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND**</u>
       <u>**ENFORCEMENT OF SETTLEMENT AND DEBTOR'S MOTION TO ENFORCE**</u>
8      <u>**SETTLEMENT AGREEMENT, VACATE DISMISSAL FOR DAMAGES AND FOR**</u>
       <u>**SANCTIONS**</u>

9

10        **BEFORE:    Judge Barbara Ellis-Monro**
          **DATE:      January 20, 2026**
          **PLACE:     Courtroom 1402**
11                     **United States Bankruptcy Court**
                       **Atlanta, Georgia**
12

       <u>**IN ATTENDANCE:**</u>
13

14      Pro se Debtor:               Curtis Parker
                                     1149 Autumn Glen Way
15                                   Dacula, GA 30019

16

17

18

19
          Proceedings recorded by electronic sound recording,
20          transcript produced by transcription service

21
          **YourTranscriptionist.com**
22          **P.O. Box 1312**
            **Fayetteville, GA 30214**
23             **404-583-3295**

24

25

1

**Appearances Cont'd**

2

Counsel for 2017-1 IH              Matthew Franklin Totten
Borrower LP                        The Totten Firm, LLC

3                                  5579 Chamblee Dunwoody Rd.
                                   Ste B-136
4                                  Atlanta, GA 30338

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**INDEX**

2

**Witnesses**                                                          **Page**

3

Mr. Parker

4

   Direct Examination by Mr. Parker                              6

   Cross-Examination by Mr. Totten                              10

5

| **Exhibits** | **ID.** | **EVID.** |
|---|---|---|

6

| Exhibit F | 12, 15, 37 | |

7

| Exhibit G | 12, 37 | |

8

| Exhibit H | 11 | |

9

| Exhibit J | 26, 27, 28 | |

10

| Exhibit K | 22 | |

11

| Exhibit L | 23 | |

12

| Exhibit Q | 18, 21, 32 | |

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2                                                    11:00 a.m.
 3            THE COURTROOM DEPUTY:  All rise, please.
 4            THE COURT:  Good morning.
 5            UNIDENTIFIED SPEAKER:  Good morning.
 6            THE COURT:  You may be seated.
 7            THE COURTROOM DEPUTY:  Good morning, Your Honor.
 8            THE COURT:  Good morning.
 9            THE COURTROOM DEPUTY:  We are on the record in
10     the matter of Curtis Parker case number 25-61216 on
11     Debtor's Emergency Motion for Temporary Restraining Order,
12     Preliminary Injunction and Enforcement of Settlement, and
13     uh, Debtor's Motion to Enforce Settlement Agreement, Vacate
14     Dismissal for Damages and for Sanctions. May we take
15     appearances for the bench, please?
16            THE COURT:  If you would, state your name for the
17     record, sir.
18            MR. PARKER:  Yes, ma'am. Curtis Parker.
19            MR. TOTTEN:  Good morning, Your Honor. Matthew
20     Totten hear for the Respondent.
21            THE COURT:  All right. Gentlemen, I have reviewed
22     all the papers and I will just say as I generally
23     understand the underlying issue, it is a settlement
24     agreement that was, uh, counter offer was made via email on
25     December 29, which was accepted and a dispute as to what,
```

4

1    uh, 2017-1 IH Borrower LP shall account and remit to Parker

2    and provide evidence of the same to Parker within ten

3    business days of acceptance means. Is that - do you both

4    agree with that?

5            MR. PARKER:  Yes, ma'am.

6            MR. TOTTEN:  Yes, Your Honor. I think it's just

7    the performance generally as to who's performed and how

8    they perform on the settlement.

9            THE COURT:  And what those words meant. It

10   appears that Mr. Parker believes they meant he was supposed

11   to receive funds, and it appears that your client believes

12   that it meant they could credit the account.

13           MR. TOTTEN:  That's correct, Your Honor.

14           THE COURT:  All right. All right. So, having said

15   that, my general practice is to waive opening and go into

16   evidence. I do note that Mr. Totten filed a witness list

17   and, uh, exhibits. And as the movant, Mr. Parker, you would

18   have the first opportunity to present evidence. So what,

19   what evidence do you have this morning of the intent of the

20   language of the settlement agreement and, uh, the facts

21   that have transpired that have caused the, uh, motion to

22   enforce it in addition to the response that was filed, uh,

23   this morning?

24           MR. PARKER:  Mr. Totten hasn't given me a copy of

25   anything that he has submitted to the Court. I thought

1  that, uh, he would provide copies.

2         MR. TOTTEN:  Your Honor, that's not accurate. I

3  actually have an email. I emailed everything over to, uh,

4  Mr. Parker on Friday evening and I have as much here.

5         MR. PARKER:  Okay. I thought you would bring a

6  hard copy. That's fine I, I, I responded to those

7  documents. Uh, yes. Yes, Your Honor, I'm prepared to speak

8  on that.

9         THE COURT:  All right. Well, this is an

10  evidentiary hearing. So, if you want me to consider factual

11  testimony, you need to come up to be sworn and have a seat

12  in the witness box.

13         MR. PARKER:  Yes, ma'am. I'm sorry.

14         THE COURT:  All right.

15              **CURTIS PARKER, WITNESS, SWORN**

16                  **DIRECT EXAMINATION**

17         THE COURTROOM DEPUTY:  Please be seated. This is

18  the microphone. Please make sure you speak directly into

19  it. Just make sure, uh, state your full name for the record

20  and spell your last name.

21         THE WITNESS:  Okay. Thank you.

22         THE COURT:  Go ahead. And if you would state your

23  name and spell your last name please.

24         THE WITNESS:  Uh, uh, okay. My name is Curtis

25  Parker. Last name, P-A-R-K-E-R.

1          THE COURT:  All right. So, Mr. Parker, this is

2    your opportunity to tell me, uh, what has transpired, what

3    you think I need to know about the situation. Mr. Totten

4    will have the opportunity to cross examine you. So, go

5    ahead, sir.

6    BY THE WITNESS:

7        Yes, sir (sic). I think Mr. Totten has kind of boiled

8    this down to what does the word remit mean, but I'll also

9    speak on a couple other things. Uh, the landlord admits a

10   binding settlement exists. So, that's undisputed.

11         THE COURT:  Okay. So, this is your opportunity to

12   tell me factually what has happened. Argument is for when -

13   -

14         THE WITNESS:  Oh, yes, ma'am.

15         THE COURT:  -- the evidence is closed.

16         THE WITNESS:  Yes, ma'am. I'm sorry.

17   BY THE WITNESS: (Resuming)

18       Uh, uh, the landlord committed some violations when my

19   bankruptcy stay was in place. We filed a motion with the

20   Court regarding that. I was contacted by Mr. Totten

21   regarding resolution of that. He asked me to send him an

22   itemization of all the violations, uh, which we did. We

23   charged him a thousand dollars per violation. He also sent

24   an email threatening that if I did withdraw, uh, the stay

25   complaint, that he would mention information regarding my

1    bankruptcy. We charged in $2,000 for that email.

2        Mr. Totten countered after speaking with his client

3    for $7,000, the repayment of my, um, um, security deposit

4    and the agreement that everything was resolved and I could

5    stay at the property until the end of January. I acted on

6    that contract by coming to the Court and filing a motion to

7    dismiss. Uh, after the ten days, I contacted Mr. Totten

8    about - prior to contacting Mr. Totten, I reached out to

9    him about could the funds be deposited direct deposit

10   because, uh, I had already changed my address for the

11   residence and, uh, if that was possible. He sent a

12   response, give me your new address. I sent him the new

13   address expecting, expecting the funds would be delivered

14   there. After the ten days had been exhausted, I reached out

15   to him, where's the funds? Late that night, early that

16   morning I get a response about it was put toward an

17   accounting aspect and I would be receiving no funds. This

18   was never spoken of in the contract. It's on him to bring

19   clarity to the contract. The contract says that all matters

20   are resolved upon payment and me moving out.

21       The day after I signed the contract with him, there's

22   a note on my door evicting me. My thoughts at the time was

23   something has crossed in the mail. I just have - I just

24   spoke to Mr. Totten and we have an agreement. I have a

25   contract. So, this crossed in the mail. I never even

1   reached out to him 'cause it had to have crossed. He's an

2   attorney. This is a binding contract. The last thing I

3   thought would be treachery. So, I don't even respond to

4   him. Assume that hey, it's crossed in the mail. The next

5   day I get a mailing, same documents, eviction documents.

6   Again, I, I had spoke to Mr. Totten. I got a contract, an

7   agreement. So, this has just crossed in the mail. I don't

8   even reach out to him. What else could it be, but it

9   crossed in the mail.

10      Mr. Totten sends me an email. Mr. Parker, I need you

11  to go to the courthouse and file that motion to dismiss, as

12  you promised you would do. So, he had sent something to the

13  Court, you know, on our initial agreement. I think

14  something saying that we had entered into an agreement. So,

15  I said, I thought that, that document you sent sufficed

16  that. He said no, you'll need to send something to the

17  courthouse. I come down here, file a motion to dismiss. I

18  speak about the settlement agreement as the cause for this

19  dismissal. So, you can only imagine when I woke up Saturday

20  morning, read his email that treachery is afoot.

21      This is basic contact law. For them to even think that

22  they court skirt, squirm and this company Invitation Homes

23  has just settled a $48 million settlement with the Federal

24  Trade Commission for the same conduct.

25          MR. TOTTEN:  Your Honor, objection. That's not

1    relevant for, for the purposes of today.

2          THE WITNESS:  I'm sorry, Your Honor.

3          THE COURT:  Okay. I'll strike that testimony. Go

4    ahead, Mr. Parker.

5    BY THE WITNESS: (Resuming)

6        Uh, yes. But, that's about the gist of it, Your Honor.

7    When I found out that he did this, I filed the appropriate

8    motions stating what he had done, stating what he was

9    attempting to do and the motion to stop this eviction. One

10   hand, I got a settlement. The other hand, I got an eviction

11   notice. I'm not even sure what they're doing. What kind of

12   practice is this? But that, that's the gist of what has

13   happened, Your Honor.

14         THE COURT:  All right. And Mr. Totten, did you

15   have questions?

16         MR. TOTTEN:  Yes, I do, Your Honor.

17                    **CROSS-EXAMINATION**

18   BY MR. TOTTEN:

19       Q.   Mr. Parker, you, you testified just a few moments

20   ago, um, as to the nature of our settlement negotiations.

21   Did we ever speak on the phone?

22       A.   No. I think you actually termed the contract as a

23   email contract. I think you specified the type of contract

24   it was in your contract.

25       Q.   But we never spoke then?

 1      A.   No. No, sir.

 2      Q.   When you --

 3      A.   Uh, I would like to say this. When you first

 4  contacted me, I asked that all future communications be

 5  done via email or in writing, as so none of this could

 6  happen. And, you know, something could be called into

 7  question about what was said. So I, I literally when he

 8  first contacted me about settlement, I said going forward,

 9  please contact me via email or writing.

10      Q.   Sure. Um, Mr. Parker, you mentioned - you used

11  the phrase eviction notice. Were you served anything by a

12  Sheriff's deputy?

13      A.   No. I think your document spoke pretty clearly.

14  You are evicted. You are to take your key to the leasing

15  agent and to move immediately.

16           MR. TOTTEN:  If I may?

17           THE COURT:  Yes.

18  BY MR. TOTTEN: (Resuming)

19      Q.   Mr. Parker, is Exhibit H, is that the

20  correspondence that you're referencing as to the eviction

21  notice?

22      A.   No. I believe there's a cover letter that went on

23  top of this, that pretty much stated, take, take key to the

24  landlord. Do you have that by chance? Oh, right. Okay, this

25  is the document. Please contact your landlord to return

1    your keys and schedule a move-out inspection.

2         Q.    Okay. Perfect. Um --

3         A.    Yeah and, uh, this says termination of lease and

4    demand for possession of 1149 Autumn Glen Way, hereinafter,

5    uh, hereinafter the premises.

6         Q.    So, so, you agree that, that's a demand for

7    possession?

8         A.    Uh, I agree that it says termination of lease and

9    demand for possession as it reads.

10         Q.    Okay. Mr. Parker, you mentioned the settlement

11    discussions. Are Exhibit F and Exhibit G representative of

12    the offer that was presented to you and your acceptance?

13         A.    What's your question again, Mr. Totten? I'm

14    sorry.

15         Q.    Is Exhibit F representative of the settlement

16    offer that was presented to you by my office and is Exhibit

17    G representative of your acceptance of that offer?

18         A.    You don't have anything written on it with regard

19    to Exhibit G or F.

20         Q.    It's up at the, the top uh . . .

21         A.    I'm sorry (indiscernible). I'm missing it.

22         Q.    Exhibit F, right here.

23         A.    Okay.

24         Q.    Exhibit G, right there.

25         A.    This appears to be, uh, the settlement agreement.

1    Q.    Okay. Within the settlement agreement, would you

2    agree that the operative words are, um, that, that we're

3    really here on is the phrase account and remit?

4    A.    Well, I think the word we're here for is the word

5    remit.

6    Q.    Would you - so, is it, is it your testimony that

7    you believe the word account is surplusage? It doesn't have

8    any legal effect?

9    A.    No. I think that, uh, that was entered in some

10   type of scandalous, uh, treacherous - remit is the dominant

11   word. Remit means to pay. Your client agreed to pay. If

12   there is any ambiguity in that contract, it falls upon you.

13   This matter was considered completely resolved upon my, my

14   performance, which is coming to the courthouse, which I

15   would never have done and filing a motion to dismiss. I

16   acted on this promise to my detriment.

17   Q.    So, so just so I understand, you don't give the

18   word account any weight because you do it as treachery. Is

19   that, is that your understanding?

20   A.    I, I think for you to give any, uh any reverence

21   is to be legal trickery. Remit, settlement agreement with

22   layman, is a settlement agreement. A move-out date with a

23   layman, is a move out date. Remit means to pay. Uh, I don't

24   think there's no one in this room that don't understand

25   what that means. Now to use the word account to circumvent

 1   remit -- now, if you had accounting issues with regard to

 2   Mr. Parker, these funds would be put toward this or there

 3   are other issues. It's not. This contract closed this

 4   matter out upon receipt of my funds. Now, another aspect of

 5   this was I was to receive my security deposit. It's obvious

 6   now that they're not operating in good faith, so what hopes

 7   do I have of getting that? Little to none.

 8       Q.   Sir, you used the phrase during your testimony in

 9   describing what occurred as an accounting aspect and I'm

10   quoting that directly. Would you not agree that, um, an

11   accounting or an accounting aspect is exactly what occurred

12   (indiscernible, crosstalk)?

13       A.   No, sir. I agree that if you had an issue with

14   accounting, you should have been specific. It is on you to

15   be specific. If your contract is vague, that falls on you

16   and your client.

17       Q.   Sir, how is the word account vague?

18       A.   How is the word remit not understood by everybody

19   in this room within ten days?

20       Q.   Okay. Um --

21       A.   Tell me, Mr. - why did you ask for my address?

22            THE COURT:  Okay. Okay. Okay.

23            THE WITNESS:  I'm sorry, Your Honor.

24            THE COURT:  You may testify further after cross,

25   but he's --

1              THE WITNESS:  I'm sorry, Your Honor.

2              THE COURT:  -- asking questions now.

3              THE WITNESS:  Please forgive me.

4    BY MR. TOTTEN: (Resuming)

5        Q.   Mr. Parker, under the, under the fourth bullet

6    point, um, on Exhibit F and I'll give you a moment to find

7    that.

8        A.   I have it.

9        Q.   Okay. That addresses the property specifically

10   and when you're required to vacate that. Would you, would

11   you agree?

12       A.   Yes, and you can imagine my surprise when I get

13   an eviction notice the very next day.

14       Q.   Okay. Where in there does my client or where,

15   where, where is there in that settlement language does my

16   client warrant or promise that you're allowed to stay in

17   the property for that period?

18       A.   Well, let's, let's read what, what you say about

19   it. Parker expressly stipulates he shall vacate. So, if

20   it's agreed that I'm gonna vacate, the time prior to that

21   vacation would be agreed that I would be there. That would

22   be a, a reasonable understanding. The subject premises

23   known as 1149, uh, Dacula on or before January 30, 2026.

24   So, if it's agreed that I will vacate by then, the time in

25   the interim, it would be agreed that I'm to be there. Uh,

1    I'm not sure what kind of contradiction can you make - um,

2    we both agreed that I'm to be there till or before the

3    30th, but yet where is the promise? What kind of trickery

4    and treachery is this on a layman? On a lessee from a

5    nationwide, uh, a nationwide, uh, a nationwide, uh, realtor

6    with regard to, uh, landlord. I'm sorry. I'm just a little

7    - this is a nationwide landlord. Nationwide.

8              THE COURT:  Okay. Okay.

9    BY MR. TOTTEN: (Resuming)

10        Q.   Mr. Parker, your, your understanding of the

11   settlement language that you believe it gives you some sort

12   of promise to stay in the property. How do you, how do you

13   juxtapose that against the language following the

14   semicolon? Specifically, where it says, the settlement

15   agreement does not constitute a ratification or novation of

16   the lease agreement for the subject premises?

17        A.    Upon the bankruptcy, I should have been given an

18   opportunity to either continue on in this lease, catching

19   the back lease up and staying in the property for the

20   duration. They didn't have a say, so they didn't present

21   that to me because we entered into this agreement. So,

22   therefore, I didn't need to catch the back rent up. I

23   didn't need to agree to pay all rents going forward until

24   the end of the lease because this agreement superseded it.

25   They did not produce anything saying Mr. Parker, do you

1   want to continue in this lease? Mr. Parker, do you want to

2   pay the back rent and pay the rent going forward at X

3   amount of dollars? This contract is binding.

4        Q.   So, so, Mr. Parker, you raise an interesting

5   point. You're, you're, testifying there that you had some

6   concerns about not being offered, I guess, just to take

7   what you've just said there, an option to continue to pay.

8   In your, in your bankruptcy petition you swore under oath

9   that you only had monthly income of $228 a month to buy

10  food stamps. How would you anticipate in paying that lease

11  obligation respectively?

12        THE WITNESS:  Uh, Your Honor, my bankruptcy

13  proceedings are irrelevant and I would ask - and I object

14  to them being brought up in, in these proceedings regarding

15  what the word remit means. I object.

16        THE COURT:  Oh, they're not irrelevant, but for

17  them we wouldn't be here.

18        THE WITNESS:  Yes, sir (sic). Yes, sir (sic).

19        THE COURT:  But, I will allow the question, but I

20  don't, I don't want to, uh, traverse down this road very

21  far.

22        MR. TOTTEN:  Yes, Your Honor.

23  BY THE WITNESS: (Resuming)

24        A.   What's your question again?

25        Q.   My question was you expressed in your testimony

1    just a few moments ago about your, I guess, disappointment

2    and interests about continuing to pay in the property, uh,

3    stay in the property and pay the rent. My question for you

4    was, how did you anticipate being able to pay the rent when

5    your bankruptcy - bankruptcy petition you identified only

6    $228 a month of food stamps as your only source of income?

7         A.   I'm talking about what the law says you're

8    required to do. You're required to offer me the option to

9    stay in the home, pay the back rent and agree to pay future

10   rents. That's your obligation to me that you failed.

11        Q.   That's not my question. Do I need to repeat it

12   again or are --

13        A.   Uh, I object, as being moot and not in connection

14   with remitting $7,000.

15        Q.   Mr. Parker, the Judge already addressed your

16   objection. Please answer the question.

17             THE WITNESS:  Uh, I'm hoping to get a job, Your

18   Honor. All I can do is hope that things would change in the

19   future. That's all I can hope for. I'm looking for work.

20   I'm a fraud investigator. I work for, I work for banks,

21   national banks on fraud.

22             THE COURT:  Okay. All right. Let's move on.

23             MR. TOTTEN:  Yes, Your Honor.

24   BY MR. TOTTEN: (Resuming)

25        Q.   Mr. Parker, under, um Exhibit, Exhibit, um, Q,

1   which I'm sending here to you. That's a ledger dated

2   January 9th of 2026. If you go to the last page, would you

3   agree that a $7,000 credit was applied to your ledger?

4        A.    I never agreed to a $7,000 --

5             THE COURT:  Okay. That wasn't the question. The

6   question was --

7   BY THE WITNESS: (Resuming):

8        A.    Oh, oh, I've not, I've not read the document.

9   What am I to do here? Where am I to find this information?

10  I see the last, the last --

11       Q.    Last page.

12       A.    -- information I have is $2,408. Where am I to

13  find this information?

14            THE WITNESS:  It's just been presented to me,

15  Your Honor. I don't know if this is valid. I've not

16  reviewed it for authenticity.

17            THE COURT:  Well, are you objecting to the

18  authenticity of the document?

19            THE WITNESS:  No, because it's moot.

20            THE COURT:  All right.

21            THE WITNESS:  It's a $7,000 remittance to me, not

22  to any account.

23  BY THE WITNESS: (Resuming)

24       A.    Uh, I see you - settlement due to default on

25  bankruptcy filing. What is that about?

1          Q.   Do you see that there's a $7,000 credit applied

2     to your --

3          A.   I gotta know what the, what the - what - it says

4     --

5               THE COURT:  Okay. This is what we're gonna do.

6               THE WITNESS:  Mmm-hmm (affirmative).

7               THE COURT:  We're gonna take a short recess. I

8     want you to show him the exhibits you're gonna show him and

9     then you can ask the questions because while you're

10    testifying asking the, asking the questions is not

11    appropriate.

12              THE WITNESS:  Yes.

13              THE COURT:  So we're gonna to take about a ten

14    minute recess while you all --

15              MR. TOTTEN:  Yes, Your Honor.

16              THE COURT:  -- do that and then I'll be back.

17              THE WITNESS:  Thank you, Your Honor.

18              THE COURT:  Thank you.

19              THE COURTROOM DEPUTY:  All rise, please.

20       [WHEREUPON, there was a break recess taken at 11:33:15

21         AM][WHEREUPON, proceedings resumed at 11:41:10 AM]

22              THE COURTROOM DEPUTY:  All rise, please.

23              THE COURT:  Be seated, please. All right. Uh, go

24    ahead, Mr. Totten.

25              MR. TOTTEN:  Thank you, Your Honor.

1  BY MR. TOTTEN: (Resuming)

2      Q.   Mr. Parker, I believe we left off where I'd ask

3  under Exhibit Q whether there was the $7,000 credit as, as

4  outlined in the settlement agreement that exists on the

5  ledger?

6      A.   Uh, can you tell me what the purpose of, of what,

7  what the ledger says the $7,000 was for?

8      Q.   Do you see a $7,000 credit? Yes or no?

9      A.   I see, uh, settlement due to default on

10  bankruptcy filing $7,000. That has nothing to do with me.

11          THE COURT:  Okay.

12  MR. TOTTEN: (Resuming)

13      Q.   You don't, you don't agree that we entered into a

14  settlement agreement, Mr. Parker?

15      A.   It says bad debt, settlement due to default on

16  bankruptcy filing. That has nothing to do with me. I've not

17  defaulted on any bankruptcy filing and I'm not in bad debt

18  so, that's not applicable to me. Can you tell --

19          THE WITNESS:  May I ask, I don't know.

20          THE COURT:  No.

21          THE WITNESS:  Not at this time?

22          THE COURT:  That was what the recess was for.

23          THE WITNESS:  I'm sorry. Yes, ma'am.

24          THE COURT:  All right.

25          THE WITNESS:  I asked for an explanation and he

21

1    could not give it.

2         THE COURT:  All right. Well, there is a $7,000

3    credit --

4         THE WITNESS:  Yes, ma'am.

5         THE COURT:  -- reflected.

6         THE WITNESS:  Yes, ma'am.

7         THE COURT:  All right. Thank you.

8    BY MR. TOTTEN: (Resuming)

9         Q.   Mr. Parker, I would like to next direct you to

10   Exhibit K, which is up there with you. You went over during

11   the recess. Um, does that email dated Saturday, January

12   10th look, look familiar to you?

13        A.   Uh, yes.

14        Q.   Okay. Are you aware that this email is

15   substantively what was set forth in our response to your

16   motion that was filed?

17        A.   I'd have to see the motion and let it read for

18   itself. Do we have the motion by chance?

19        Q.   Yes. It's the motion you, you stipulated earlier

20   that you've received on Friday, the response to your

21   motion.

22        A.   Uh, the document reads, uh, as it reads. Again, I

23   don't wanna look at this document and speak to a motion. I

24   have to have the document in hand, but this document reads

25   as it reads. Is there anything I need to be extrapolating

1    out of here?

2        Q.    I'll ask you again. Does this email, dated

3    Saturday, January 10th look substantively similar to what

4    we filed in response to your motion?

5        A.    I don't know. I don't have motion.

6        Q.    Okay.

7        A.    I'm familiar with this email --

8        Q.    Okay.

9        A.    -- uh, and it looks familiar. Um, but I don't

10   have the motion so I won't make a mistake and speak on a

11   document I don't have in front of me, but I'm familiar with

12   this email if that, if that helps you.

13       Q.    Okay. That, that, that is helpful. Mr. Parker,

14   next I wanna address you - sorry, direct your attention to

15   Exhibit L and that is an email that you sent January 15th,

16   6 - 7:00 a.m. to myself and Elvis Gurenjack (ph). I might

17   be botching that name. Does that look familiar to you?

18       A.    Yes.

19       Q.    And what's your understanding why that email,

20   which immediately preceded your January 15th email from

21   Elvis? What was your understanding of the reason that Elvis

22   sent that email on January 12th to you?

23       A.    He wanted to put a lockbox on my house. And I

24   told him no because you guys had breached the contract.

25       Q.    Okay. Was it your understanding that the lockbox

1    was being put on the property to facilitate your move-out

2    that you agreed to on January 30th?

3        A.    Uh, when I got the eviction notice, I just

4    thought it was part of the eviction process.

5        Q.    Would you agree that the email that Elvis sent

6    you on January 12th identified that quote, I am reaching

7    out to you because we received communication from your

8    property manager that you'd be moving out as of January

9    30th, 2026?

10       A.    You just stated in the Court I had no rights to

11   put any belief in that. Yeah, that was my understanding.

12   That's what we agreed to, but you just earlier said, what

13   is it in this contract that made you think you had access

14   to this property by the 30th? It's a contradiction.

15       Q.    Well, when - that's an argument Mr. Parker I'm

16   not asking you to argue right now. Would you agree that you

17   were provided information in that email about where to

18   deposit your keys upon you vacating the property?

19       A.    The lease being terminated. You're being evicted.

20   Take your key to your property manager. That was in your

21   first email, right. And then he followed up saying hey,

22   we're gonna put a lockbox on your house. I had to let him

23   know you're not doing that because you're in breach of the

24   contract and I cc'd him on it. I cc'd you on it.

25       Q.    Mr. Parker, would you agree that in your January

24

1    15th email you stated that you were going to refuse to

2    vacate the property by January 30, 2026?

3        A.    I stated you were in breach of an agreed upon

4    move-out date; that you sent me eviction paperwork and, and

5    and wanted to put a lockbox on my house. The contract was

6    breached, nothing in it was valid and it was void. I was

7    not --

8        Q.    That's not - that was not my question, Mr.

9    Parker. Let me ask you it again.

10       A.    All right.

11       Q.    Would you agree in your January 15th email that

12   you stated you would not vacate the property on or before

13   January 30th of 2026?

14       A.    I agreed the contract was breached and without,

15   uh, settlement and further understanding why would I leave?

16   I have at least till April.

17       Q.    So it, so it's your present intent not to vacate

18   the property as of January 30, 2026?

19       A.    I had agreed to have reserved movers to be out of

20   the property before the 30th because I'm gonna honor and

21   perform my portion of the contract. Now, why is it you will

22   breach it and then expect performance from me? You

23   yourself, said Mr. Parker, what is in this contract to make

24   you think you have access to this property till the 30th,

25   even though we both said Mr. Parker will be there till the

1   30th on or before. Where am I? In Bizarro World?

2       Q.   Mr. Parker, I believe the last exhibit I wanna go

3   over with you at least presently pending any further

4   testimony you might have, um, is Exhibit J. Do you have

5   Exhibit J up there in front of you?

6       A.   Uh, yes, sir.

7       Q.   Okay. What do you understand to be contained in

8   these emails that you sent to my office, generally?

9       A.   Uh, I'll need you to be a lot clearer than that

10  general question there. What do you mean, sir, please help

11  me?

12      Q.   Well, I - would you agree that the, the four

13  emails that you sent within Exhibit J are very similar to

14  what you were stating to me while the Judge was in recess?

15      A.   Repeat what I said. I - based on what you've

16  done, I can't think that you're operating with me in good

17  faith. So, if you'll just tell me what I said, I'll agree

18  or disagree.

19      Q.   Okay. Did you not threaten to, uh, report my

20  client to the local media?

21      A.   I intend to bring the actions of your client to

22  the media and to the FTC for protection of the public and

23  to let them know going forward what your company thinks

24  remit means.

25      Q.   Okay.

1      A.   They need to  - the public needs to be made aware

2  of the actions of your client.

3      Q.   Did you not threaten to file a bar complaint

4  against me?

5      A.   I've already filed it.

6      Q.   Okay.

7      A.   It's been filed and you have you a - and you're

8  aware of that. So, you, you have knowledge of that.

9      Q.   Okay.

10     A.   I've not done that behind your back.

11     Q.   Mr. Parker, would you agree on page 2, which is

12  the - of Exhibit J, the January 10th, 8:14 email, um, to my

13  office that you were threatening to proceed with those

14  actions, um, filing the motion that we're before the Court

15  today, making the FTC claim, sending - contacting the media

16  and making a bar complaint if we did not --

17     A.   No.

18     Q.   -- uh --

19     A.   No, no. The bar complaint has already been made,

20  so there can't be a correlation there. You all - you guys

21  have - you have a settlement with the FTC. Your actions are

22  violated it. It is upon me and this Court, if they so

23  choose to, to make you self report.

24     Q.   Okay. Let me --

25     A.   The FTC brought a claim against you to protect

1    the public. You agreed to this, but now with me, you're

2    participating in the same action you agreed to settle

3    against. So the Court, if they chose - choose to, can make

4    you self report, but me as an individual, a renter and a

5    citizen, will put forth the documents that are in these

6    pleadings. I'm not gonna say a thing. I'll just put forth

7    the pleadings.

8        Q.   That, that - you didn't answer my questions. So,

9    let me, let me direct you specifically where.

10       A.   Thank you.

11       Q.   If you could turn to page 2 of Exhibit J. Yep,

12   that's page 1.

13       A.   That's page 2.

14       Q.   Nope.

15       A.   All right.

16       Q.   You skipped over there.

17       A.   That's page 1.

18       Q.   Page 2.

19       A.   Oh, okay on top. All right.

20       Q.   Yep. Um, do you see that last paragraph? Unless -

21   beginning with unless? And so, I'll ask that question

22   again. Did you not threatened to, to file a motion with

23   this Court, file a claim with the FTC, contact the local

24   media and make a bar complaint if we did not give in to

25   your threats?

1          A.    So, I'm threatening and twisting your arm about

2     my $7,000? Uh, uh, the document is the document. Are you

3     saying that I, I have the ability to twist your client's

4     arm? Hold something on your client's head? I have a right

5     to bring to the public's attention the acts of your client.

6     The FTC has already, the FTC has already done so. You guys

7     have entered into a settlement that you would not do what

8     you're doing here. That you would not come into Court

9     promising to remit monies and then back doing it and

10    applying it to some phantom internal accounting. The

11    document says that this is - these $7,000 are remitted to

12    bad debt, settlement due to default on bankruptcy filing.

13    That's not true. That's not accurate. It should say that,

14    settlement for stay violations. That's what the settlement

15    was about. That's what is was for. With that I agreed to

16    move out.

17          THE WITNESS:  They had two options, Your Honor.

18    Either let me stay till April or pay the monies. They said

19    pay the monies. I was fine - trying just to stay to April.

20    I didn't have to have the monies. It was either/or.

21          MR. TOTTEN:  Uh, Your Honor, I don't believe I

22    have any, any further questions for Mr. Parker at this

23    time.

24          THE COURT:  All right. Thank you. Mr. Parker, is

25    there anything else that, uh, from a factual standpoint,

1    not argument, that you would like to tell me before you

2    step down?

3              THE WITNESS:  Uh, no, Your Honor, other than.

4    Invitation Homes agreed that the settlement

5    (indiscernible). They say that they have performed. We say

6    they have that. We say the word remit means pay. I asked

7    him to send the monies direct deposit. He said, Mr. Parker

8    give me your new address. It would give anyone the

9    assumption that they're gonna send the monies to the new

10   address. That's all, Your Honor.

11             THE COURT:  All right. Thank you much. You may

12   step down.

13             THE WITNESS:  Okay. Can I call Mr. Totten to the,

14   uh, to question him?

15             THE COURT:  No. He is, he is representing his

16   client. He can't --

17             THE WITNESS:  Oh, yes, ma'am. That's fine.

18             THE COURT:  -- he can't - he's not, a witness

19   today.

20             THE WITNESS:  Yes, ma'am. That's fine. But I, I

21   would ask that the record reflect that I, I, I asked what

22   settlement due to default on bankruptcy filing was. I also

23   asked why was this settlement put under bad debt. It's not

24   a bad debt and I'm not default in the bankruptcy.

25             THE COURT:  All right.

1           THE WITNESS:  Thank you, Your Honor.

2           THE COURT:  Thank you. All right. Is there any

3   other evidence that either of you wishes to put on this

4   morning?

5           MR. TOTTEN:  Your Honor, the only I would like to

6   speak as to here is, um, the, um, attorneys' fees that have

7   been incurred since, um, the --

8           THE COURT:  All right. We're gonna hold on that.

9           MR. TOTTEN:  Okay. Okay. Thank you, Your Honor.

10          THE COURT:  We're gonna hold on that. Mr. Parker,

11  you can choose to go first or go second with respect to

12  argument. Would you like to wait until the end or would you

13  like to go first?

14          MR. PARKER:  I'll go to the end, Your Honor.

15          THE COURT:  All right.

16          MR. PARKER:  I don't think that I can very - add

17  very much more to the argument.

18          THE COURT:  All right. Mr. Totten?

19          MR. TOTTEN:  Yes, Your Honor. Um, I believe this

20  is a very straight forward motion before this Court. As you

21  heard Mr. Parker testify, despite Georgia law requiring

22  words in a settlement to be given equal meaning such as

23  account and remit. Mr. Parker gives zero weight to the word

24  account because he doesn't like it. Um, the word account as

25  is (indiscernible), in fact, was used by Mr. Parker, was

1  applied here. An accounting aspect particularly, is what

2  Mr. Parker described the application of the $7000 credit

3  for. There, there is no, no controversy but that an

4  accounting - that, that the account was applied and

5  credited. There is no controversy that in light of this

6  Court's prior motion for relief order as to the, um, the

7  lease at issue here, that Mr. Parker has remained in post

8  petition delinquency on his rent based on the plain

9  language of the account and remit within the settlement

10 agreement that the parties already agreed to. My client was

11 well within its rights to apply the $7,000 to the post

12 petition debt as set forth in our response as well as

13 illustrated by the Exhibit Q. Mr. Parker has approximately

14 $4,000 remaining of post petition that even after the

15 application of that $7,000 credit.

16      To, to - in addition to the definitions that we

17 cited, which as to accounting, account and remit, which Mr.

18 Parker has pointed to no authority otherwise, I, I believe

19 that really the purposes of this Bankruptcy Court would,

20 would be frustrated and Mr. Parker would be leveraging the

21 bankruptcy process as a sword not a shield in, um, in him

22 seeking to recover as much in light of his admissions

23 within the pleadings as to maintaining an Airbnb operation

24 at the property. Certainly we don't --

25      MR. PARKER:  We object.

1                MR. TOTTEN:  -- we don't need to go into any --

2                MR. PARKER:  That's not true. He knows that's not

3        true, Your Honor. He has confirmation that's not true and

4        to say it --

5                THE COURT:  Okay. All right.

6                MR. PARKER:  I'm sorry, Your Honor.

7                THE COURT:  All right.

8                MR. TOTTEN:  He's admitted several times in the

9        pleadings. So, it's uncontroverted as to his operations of

10       an Airbnb facility. So, in addition, because none of that

11       was disclosed in the petition, again, Mr. Parker is

12       attempting to use the bankruptcy process in a very

13       selective way. He's trying to have his cake and eat it too,

14       to bar (indiscernible). That's not what this Bankruptcy

15       Court (indiscernible). So in addition to the plain language

16       settlement agreement, Mr. Parker is admitting his intent to

17       continue to abuse the bankruptcy process in his filing that

18       motion.

19               So, Your Honor, in addition to the settlement

20       agreement itself where we are allowed to apply that account

21       and the $7,000, we are also entitled to recover our

22       attorneys' fees in light of the motions to enforce the

23       settlement agreement. Based on that, I'm not sure when the

24       Court is ready to hear that portion of what the fees are. I

25       have exhibits up through yesterday as to what that activity

1    was. Uh, my hourly rate is $275.00 an hour.

2            MR. PARKER:  I object, Your Honor. His fees have

3    nothing to do with me. That, that goes to his, uh, uh,

4    client. And that is nothing but an intimidation, uh,

5    factor, Your Honor. I shouldn't have to know what his fees

6    are because I'm not paying them. So, that's a, that's a

7    intimidation, Your Honor, and I wanna object and go on the

8    record that he's just assaulted - intimidated me in open

9    court.

10           THE COURT:  All right. So noted --

11           MR. TOTTEN:  And, Your Honor --

12           THE COURT:  -- for the record.

13           MR. TOTTEN:  -- to date, I have expended ten and

14   a half hours, uh, as of yesterday of time and post part -

15   our full performance from January 9th. So it's from January

16   10th following. We are about an hour in so, we would, we

17   would seek the additional time that the Court determines

18   would be appropriate for today at the rate of $275.00. Um,

19   and, Your Honor, in light of Mr. Parker's testimony about

20   his January 15th email refusing to facilitate the

21   settlement process, particularly in him vacating the

22   property by January 30th, we would also ask that this Court

23   seek to enforce Mr. Parker's compliance.

24           As to the possession, you know, as argued in our

25   response, there's no question that my client made no

34

1   representations. And, in fact, expressly disclaim any

2   representations about any right to - for him to occupy the

3   property to January 30th. That being said, as we stipulated

4   in our response, we have not filed a dispossessory

5   proceeding to date and we only intend to should Mr. Parker

6   fail to timely vacate the property as agreed to in the

7   settlement agreement on January 30th.

8          And finally, Your Honor, to the extent this Court

9   has any concerns about some of the representations and

10  misrepresentations by Mr. Parker, I, I would ask that the

11  Court consider potentially referring this matter to the

12  Trustee for evaluation under 11 U.S.C. Section 727©, um,

13  (c)(2) based on some of the admissions of failure to

14  disclose income made by Mr. Parker in the pleadings.

15         MR. PARKER:  I object, Your Honor and will take

16  this as another form of intimidation. It's irrelevant. And,

17  again, just want the record to reflect I've been

18  intimidated with regards to attorney fees and, uh, a

19  bankruptcy proceeding that are irrelevant.

20         THE COURT:  The record will reflect that, Mr.

21  Parker. Uh, your argument?

22         MR. PARKER:  Yes, sir (sic). Your Honor, this is

23  gonna come down to what you believe remit means. This is

24  gonna come down to what you think is attorney misconduct,

25  treachery upon a layman. These people are nationwide

35

1  landlords. What's being done to me, I'm not the first

2  person they've done this to. But they, they had no

3  recourse. I have some. I'm standing before you.

4  (Indiscernible) the contract, Your Honor or the contract

5  language falls on him. If he didn't speak to what account

6  these monies would go to, what, what interest they had with

7  these monies other than remitting them to me, if it's not

8  in the contract Your Honor, it's a no go. The pig don't

9  have wings. Um, it falls on the drafter of the contract to

10  be clear and specific.

11          The fact that we're here regarding account and

12  remit after you've seen the earlier drafting, the earlier

13  contact, me acting upon these, uh, uh, contracts to my

14  detriment on a layman. A layman. After a $48 million

15  settlement that said theft. So, so, we understand why the

16  FTC had to get involved.

17          MR. TOTTEN:  Your Honor, I'm saying again I

18  object to this. This is - it's argument about FTC is

19  irrelevant for purposes of today's hearing.

20          MR. PARKER:  Sorry, Your Honor. It's fine.

21          THE COURT:  All right.

22          MR. PARKER:  Second thing, Your Honor. This is

23  basic contract law, Your Honor. A contract was made. A

24  promise was made. I acted on that promise, Your Honor and

25  now they're trying to welch. They're trying to snake their

1   way out of it. Your Honor, don't let it stand. I'm a

2   layman. I represent the public. A renter. This is a

3   nationwide company. Don't know what remit means in a

4   contract. It's upon him to stipulate what he - the contract

5   should do other than perform as written. And attorney fees,

6   Your Honor, that's just pure intimidation. And he also

7   says, he wants to seek enforcement of the contract. One way

8   enforcement. I want enforcement too, Your Honor. Your

9   Honor, I'll leave on - I'll leave as the contract stated.

10  I've already reserved renters - I mean movers at my own

11  expense based of this $7,000. I'll move. It's not an issue.

12  I never had an issue with moving out. Contract breached -

13  why I gotta be obligated to it?

14          So, that's it Your Honor. This comes down to what

15  the Court believes remit means. What the Court understands

16  what contract law is. Did Mr. Parker perform. Mr. Parker

17  (indiscernible). They need to remit my $7,000, Your Honor.

18  Thank you for your time.

19          THE COURT:  Thank you both. Uh, with respect to

20  the agreement, which is memorialized in an email December

21  29, 2025, and was Exhibit F and G, that was identified by

22  Mr. Parker, um, the contract in pertinent part says 2017-1

23  IH Borrower LP shall account and remit $7,000 to Parker and

24  provide evidence of the same to Parker within ten business

25  days of acceptance. There are obviously, uh, several

1    operative terms there, account, remit provide. So,

2    certainly remit means to pay to, but account in that

3    sentence is ambiguous. It doesn't say remit on account of.

4    It says remit to Parker and then the providing of evidence

5    of the same brings into question, why that would need to

6    be, if the payment was to be to Mr. Parker. The next part

7    of the contract that seems to be in dispute, but it was

8    written by, uh, 2017-1 IH Borrower LP says, Parker

9    expressly stipulates that he shall vacate the subject

10   properties on or before January 30, 2026. It appeared to be

11   an agreement that Mr. Parker would vacate, and since it was

12   proposed by the landlord, that seemed to be an agreement.

13   But then there was, uh, a notice of move out date. It

14   wasn't, uh, dispossessory because it wasn't served, but it

15   muddied the waters.

16       All that goes to say is when a contract is

17   ambiguous, then the Court seeks to determine the intent of

18   the words. And here it is absolutely clear that what the

19   landlord intended for the words and what Mr. Parker

20   intended for the words were not the same. And I don't

21   believe there was a meeting of the minds on this contract

22   and I don't believe there was a contract. So what I'm going

23   to do today is I'm going to deny the motion to enforce. I'm

24   going to set aside the dismissal, and we're going to put

25   the evidentiary hearing back on the 31st of March.

1          I do want to explain a few things, Mr. Parker, so

2    that you understand. With an unexpired lease, such as this

3    lease, the code provides that within 60 days, the Trustee

4    shall assume or reject the contract. If the Trustee does

5    not take that action, then the contract is deemed assumed -

6    I'm sorry, deemed rejected, which means it's treated as if

7    it was breached. The contract was breached under bankruptcy

8    law. It also was breached because you were delinquent in

9    rent.

10         Your description of how you believed the landlord

11   is supposed to treat the contract sounds like a

12   reaffirmation, and a lease is not subject to reaffirmation.

13   Uh, with respect to remaining in the property. Unless

14   you're paying rent, I don't know how you believe you should

15   be able to stay in the property. I understand that you

16   thought you all had agreed that you could be there till the

17   end of January, but again, I've found that I don't believe

18   there was a meeting of the minds because there was a, a

19   disconnect on what exactly was supposed to happen with the

20   $7,000. And, uh, while the landlord very well may have

21   agreed you should have been there till the end of, uh,

22   January, they then sent you, you know, move-out date

23   information which muddied the waters. With respect to the

24   question about disclosure of income and truthfulness on the

25   schedules and statements. That is absolutely relevant. The

1    Bankruptcy Court is all about disclosing fully and

2    completely and honestly, and that is what you get - and if

3    you do that, you get a discharge in exchange.

4            Very frankly, I don't think either side has

5    really been acting in good faith here. But having said all

6    of that, we will do a short order. I will reschedule the

7    evidentiary hearing and I will set aside the dismissal of

8    the motion for violations and we will be adjourned.

9            THE COURTROOM DEPUTY:  All rise, please.

10   [END OF AUDIO]

11

12

13

14

15

16

17

18

19

20

21

22

23                        **YourTranscriptionist.com**
                          **P.O. Box 1312**
24                        **Fayetteville, GA 30214**
                          **404-583-3295**
25

1                    **C E R T I F I C A T E**

2          I, Felicia A. Harris, court approved transcriber,

3     certify that pages 1 through 40 represent a true and

4     correct transcript from the official electronic sound

5     recording of the proceedings in the above-entitled matter;

6     that this transcript was done to the best of my ability

7     based on what I heard on the audio recording itself.

8          This 21st day of February, 2026.

9

10                              /s/ Felicia A. Harris
                                Felicia A. Harris
11                              YourTranscriptionist.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25